IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CV-208-FL

| | | |
|---|---|---|
| TRACIE KNIGHT, Administrator for the Estate of Lawrence Graham, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| CITY OF FAYETTEVILLE; DENTON LITTLE, both individually and in his official capacity as a law enforcement officer with the Fayetteville Police Department; and HAROLD MEDLOCK, both individually and in his official capacity as a law enforcement officer with the Fayetteville Police Department, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion for summary judgment (DE 34), plaintiff's motions to strike and to seal (DE 71, 79, 88), and defendants' motion to strike in the alternative (DE 90). The motions have been fully briefed and are ripe for ruling. For the following reasons, the court grants in part and denies in part plaintiff's motions, denies as moot defendants' motion to strike, and grants defendants' motion for summary judgment.

## BACKGROUND

Plaintiff filed suit on May 1, 2015, in Cumberland County Superior Court, as administratrix for the estate of Lawrence Graham ("Graham"), asserting claims arising out of a May 1, 2013, traffic stop encounter between Graham and defendant Denton Little ("Little"), a Fayetteville Police Department ("FPD") officer, during which Little shot Graham twice in the back. Graham allegedly

died from complications of the shooting. Plaintiff seeks compensatory and punitive damages against defendant Little, together with the City of Fayetteville ("City") and Harold Medlock, Chief of the FPD.

Plaintiff makes claims under 42 U.S.C. § 1983 against Little in his individual and official capacities, asserting use of excessive force in violation of the Fourth Amendment. Plaintiff also asserts state law negligence claims against Little, in addition to claims against the City and Medlock, in his individual and official capacites, for deliberate indifference, wrongful death, negligence, and unconstitutional and improper policies and practices. On June 19, 2016, defendants answered the complaint, denying any liability. A period of discovery ensued, governed by consent protective order.

On July 18, 2016, defendants filed the instant motion seeking judgment as a matter of law, wherein they rest upon governmental immunity, public official immunity, and qualified immunity. Defendants also argue that plaintiff has failed to establish a genuine issue of material fact as to her claims. Defendants rely upon the written testimony of 1) defendant Little; 2) Phillip Burlingame ("Burlingame"), a second officer involved with the traffic stop; 3) Bryan Bailey ("Bailey"), Chief Firearms Instructor for the FPD; 4) Dr. Lauren Scott ("Scott"), Associate Chief Medical Examiner; 5) Chad Thompson ("Thompson"), an expert retained for the defense; 6) Douglas J. Hewett ("Hewett"), City Manager; and 7) Billy West ("West"), District Attorney. Defendants also rely upon digital video discs ("DVDs" or "dash-cam videos") storing digital data taken from police officer patrol cars at the time of the incident in question.

In response, plaintiff seeks this court to strike as untimely proposed expert testimony of Scott, the medical examiner who performed the original autopsy; West, the Cumberland County

2

District Attorney; and Bailey, a Chief Firearms Instructor with the FPD, on which defendants rely. Plaintiff contends plaintiff had no notice these witnesses would be used as experts until their affidavits were filed with defendants' motion. Plaintiff offers here the expert reports of its experts, Roger A. Mitchell, Jr. M.D. ("Mitchell"), and Gregory G. Gilbertson, M.S. ("Gilbertson"), to highlight prejudice plaintiff would suffer in the event the court was to consider testimony from these individuals. In the alternative, particularly with reference to Scott, plaintiff seeks leave to reopen discovery.

In defense of motion, plaintiff relies upon documentary evidence together with written and deposition testimony. More particularly, plaintiff argues against entry of judgment in defendants' favor with reference to testimony of four individuals as follows: 1) Little deposition transcript; 2) expert report and deposition transcript of Gilberston, Director and Professor of the Criminal Justice Program at Centralia College; 3) Burlingame deposition transcript; and 4) declaration of James E. Buxton, Jr. ("Buxton"), President of the Fayetteville branch of the National Association for the Advancement of Colored People. Plaintiff also relies upon North Carolina State Bureau of Investigation ("SBI") file number 2013-00883 regarding the incident at issue in this case (the "SBI file"); and autopsy photographs.[1]

On November 4, 2016, the court directed plaintiff to file an opposing statement of material facts as required by Local Rule 56.1. Plaintiff filed opposing statement November 22, 2016, referencing exhibits filed November 17, 2016, including SBI reports of statements made by Burlingame, Little, and Graham, as well as FPD investigatory documents including still images of the dash-cam video, diagrams of the scene, and a report of an interview with Little. Plaintiff filed

---

[1] Plaintiff filed pending motion to seal the SBI file and autopsy photographs (provisionally sealed by the court on September 15, 2016), in response to court order.

3

on November 17, 2016, another pending motion to seal which pertains to certain exhibits filed in conjunction with plaintiff's response to defendant's statement of material facts.

On December 1, 2016, defendant filed objections to plaintiff's statement of material facts, or, in the alternative, a motion to strike any reference, citation, or use of the SBI report of Graham's statement in plaintiff's statement of material facts, to which plaintiff filed a response in opposition on December 6, 2016.[2]

## STATEMENT OF FACTS

The undisputed facts, as well as disputed facts viewed in the light most favorable to plaintiff, may be summarized as follows. On May 1, 2013 at approximately 8:05 a.m., FPD officer Burlingame observed a gold Toyota Corolla operating with a window tint violation. (DE 89 at 1).[3] Burlingame initiated a traffic stop by activating his blue lights and siren and pulling behind the suspect vehicle on Sourwood Drive. (Id. at 1-2). After the suspect vehicle stopped, Burlingame exited his patrol car. Burlingame approached the suspect vehicle, and determined it was occupied by a driver and a front seat passenger. (Id. at 2). Burlingame introduced himself to the driver and stated he had been stopped "because the tint on these windows is dark." (dash-cam video 08:06:34).[4]

---

[2] The docket entry for plaintiff's response states that it is a response to "90 MOTION to Stay." Docket entry number 90, however, is not a motion to stay, but rather a motion to strike. (See DE 90). The clerk is DIRECTED to correct the underlying designation for the motion at DE 90 so that it is designated as a motion to strike, not a motion to stay.

[3] Undisputed facts are drawn from those portions of defendants' statement of facts that are admitted or undisputed by plaintiff. (See DE 35, 89). Unless otherwise specified, any citations to numbers in exhibits designated by docket entry (DE) number are to page numbers as specified on the electronic version of the document as filed on the docket, being the page number supplied by the CM/ECF system rather than the page number specified on the face of the document, in the event of any difference between the two.

[4] Unless otherwise specified, citations to "dash-cam video" refer to the video disc filed manually (see DE 38) on July 18, 2016, containing video from Burlingame's patrol car, captioned "Graham v. Fayetteville Dashcam Video of Incident 5-1-13." The time specified is the time showing and advancing chronologically on the face of the video image.

4

Burlingame asked the driver for his driver's license and registration. (DE 89 at 2). The driver of the vehicle told Burlingame that he did not have a driver's license or identification ("ID"). (Id.). The driver gave Burlingame a birthdate and name. The driver seemed very nervous. (Id.). The passenger provided an identification card with the name of Lawrence Graham, III. (Id.). Burlingame told the subjects to sit tight and that he would be back shortly. (Id. at 2-3). While Burlingame was speaking with the driver he could smell a strong odor of marijuana coming from inside the vehicle. (Id. at 3).

"[B]ecause of the smell of marijuana coming from the suspect vehicle, [Burlingame] contacted dispatch" to have another unit respond to his location to assist with the traffic stop. (Burlingame Aff. (DE 36-2) ¶8). He stated over his radio: "I want to do a search . . . this guy's kind of antsy." (dash-cam video 08:09:37). Defendant Little heard Burlingame's request for another unit and told the dispatcher he was en route. (Little Dep. (DE 74-1) 82). Defendant Little arrived on scene in about five minutes and pulled up behind Burlingame's patrol car, without activating his own lights or dash-cam video. (Id. 83-84).

While Burlingame was waiting for defendant Little to arrive, he used his computer system databases to determine that the driver of the vehicle had given a fictitious name but an accurate birthdate. It was later determined that the driver's actual name was Antoine Willis ("Willis"). When defendant Little arrived, Burlingame stated to him: "Smells like weed. The driver's lying to me," and Burlingame explained that the driver had given false information about his name. (Dash-cam video 08:13:58). Defendant Little noticed that the occupants were "moving all around" and hitting the breaks, and he suggested "you want to go ahead and pick up one of them?" (Id. 08:14:16). The officers had decided to remove the occupants and search them one at a time due to the strong odor

of marijuana coming from the vehicle and for officer safety. (Burlingame Aff. ¶12; Little Aff. ¶¶ 6-8).

Burlingame and defendant Little approached the vehicle. (DE 89 at 4). Both were dressed in their on duty uniforms which clearly identified them as members of the FPD. (Id. at 4-5). Burlingame went to the driver's door where Willis was seated, and defendant Little went to the passenger's door where Graham was seated. (Id. at 5). Burlingame asked Willis to step out of the car and explained to him the reason was that there was a strong odor of marijuana coming from the vehicle and that he was going to search him. (DE 89 at 5). Burlingame explained that defendant Little was a canine officer. (dash-cam video 08:14:38).

In the meantime, once defendant Little was at the passenger door, he saw that Graham "went to sit up and get out of the vehicle, like grabbed the door handle of the passenger side . . . on the interior, at which time [defendant Little] told him to sit tight." (Little Dep. 88). Defendant Little also can be seen on the dash-cam video motioning to Graham to stay in place. (Dash-cam video 08:14:39). Willis then complied with Burlingame's search request, stepped from the vehicle and walked back to Burlingame's patrol car with Burlingame. (DE 89 at 5). The driver's door remained open after Willis exited the vehicle to go with Burlingame. (Id.). At this point, the smell of marijuana became more prominent to Burlingame. (Id.).

Burlingame had Willis place his hands on his patrol car and began searching around the waistband of Willis for drugs. (Id. at 6). As Burlingame was searching the waist area of Willis, he discovered a bag of marijuana between Willis's pants and boxer shorts. (Id.). Further investigation revealed that Willis had several smaller bags of marijuana packaged and hidden in his pants. (Id.). He also had another bag of what appeared to be crack cocaine. (Id.).

6

Defendant Little observed portions of the search of Willis's person, and saw that there was a "plastic sandwich baggy . . . coming out of his waistband," which based on his training and experience he understood to be consistent with controlled substances and how they are packaged. (Little Dep. 90). Graham asked defendant Little what was going on with "bro" and defendant Little for the second time told Graham to "sit tight." (Id. at 89).

As Burlingame started to retrieve another plastic bag of marijuana from Willis's waist area, defendant Little observed that Willis attempted to flee from Burlingame. (DE 89 at 6; Little Aff. ¶12). Little observed that Burlingame was able to grab Willis by the bottom of his shirt and prevent him from getting away. (Id.). Defendant Little observed that Willis tried to push away from Burlingame, but Burlingame was able to keep his hands on Willis and put him on the ground. (Id.). Willis screamed loudly when he was on the ground. (Id.). At that moment, defendant Little observed that Graham had begun to move across the console of the car to flee via the open driver's side door. (Id.).

The dash-cam video reveals the next few seconds of activity involving defendant Little and Graham, which the court describes in detail in chronological order as set forth in the table below:

7

| Time | Description |
|------|-------------|
| 08:15:45 (slow motion video elapsed media time 00:11)[5] | Little, at passenger side of car looking into window, motions downward with left arm and hand.  At this moment, on the full-speed video, Willis can be heard scuffling and screaming loudly; the same sound is distorted to a lower pitch in the slow-motion video. |
| 08:15:45 (media time 00:14) | Little, at passenger side of car, crouches to look through passenger window, raises left hand back up. |
| 08:15:46 (media time 00:15) | Graham's head and shoulders emerge out of driver's side of car through open door.  Little raises head over top of car and is starting to move around trunk of car. |
| 08:15:46 (media time 00:19) | Graham moves out the driver's side open door, in sprinting position, leading with right arm and hand holding a handgun; gun barrel pointed straight out at end of arm, extending out at 45 degree angle down to ground. Little is running around trunk of car looking directly at Graham. (Corresponds to still image of video filed at DE 86-6 pp. 6 & 12). |
| 08:15:47 (media time 00:21) | Graham is completely out of car on two feet, moving to center of road, and looking to his right and facing away from Little.  Little is behind trunk of car looking at Graham. |
| 08:15:47 (media time 00:21 to 22) | Graham, with gun in hand, at center line of road, turns sharply to proceed towards area out in front of car, with left arm and leg extended out to left, in process of making sharp turn around driver's side door. Graham's right arm, hand, and gun are pointing upwards as Graham is in stride. |
| 08:15:47 (media time 00:24) | Little is in pursuit of Graham, and has just placed his hand on holster of gun. |

---

[5]  The media time specified is based upon the elapsed time indicated upon playing the slow-motion video portion of the dash-cam video, captioned "Video from off. Burlingame's Vehicle – Edited – Slow Motion Footage of Incident 5 - 1 - 13."  The actual time is shown on the face of the video image, e.g., "05/01/2013 08:15:45," whereas the slow-motion video elapsed media time is shown by the program playing the video.  For purposes of viewing the slow-motion video, the court has used a program named "VLC media player," version 2.2.4 Weatherwax, produced by VideoLAN, which is a "free and open source cross-platform multimedia player and framework that plays most multimedia files as well as DVDs, Audio CDs, VCDs, and various streaming protocols," available at http://www.videolan.org (last visited February 10, 2017).  The court notes that slow-motion video elapsed time indicated by other viewing programs, such as Windows Media Player, may not be consistent.  The media time is shown to provide more specificity as to the fractions of seconds passing in actual time.

| Time | Description |
|------|-------------|
| 08:15:47 (media time 00:25) | Graham is directly in front of Little, who is blocking the view of Graham entirely with his own body, in pursuit. Little has his hand on gun holster, starting to draw his gun from holster. |
| 08:15:48 (media time 00:26) | Graham is at center line of road, moving in direction diagonally towards the right side of the road in the area in front of the car. Graham is in running position, left foot on left center line of road, right foot in air leading his stride, right arm moving at side with gun showing in right hand. Graham's right elbow is bent at about 45 degree angle, with forearm and hand still extending out at about 45 degree angle down to the ground. Graham's head, body, right arm, and legs are in view, not yet blocked by any portion of car. Graham is starting to turn his face somewhat in view of camera and Little. |
| 08:15:48 (media time 00:26) | Graham one-half step further, in full stride, starting to turn his head towards Little. Right arm still holding gun and pointed at an angle towards the ground. Little also in full stride continuing to move hand upwards drawing gun from holster.<br>(Corresponds to still image of video filed at DE 86-6 p. 11). |
| 08:15:48 (media time 00:27) | Graham has turned head to face Little, at the moment Graham is in the view right before the left edge of the driver's side door. Graham's shoulder is aligned in the view just above the top left corner of the driver's side door. Graham's face is visible immediately above his shoulder looking back. |
| 08:15:48 (media time 00:27) | Graham one step further, with his head turned so his face is partly visible to camera and Little. Graham's right arm is now bent at elbow, with hand raised higher with gun still in hand, as visible through the open driver's side window of car. Little still in full stride in pursuit, with gun in hand now fully out of holster.<br>(Corresponds to still image of video filed at DE 86-6 pp. 9 & 10) |
| 08:15:48 (media time 00:28) | Graham's head and shoulders cross into the area on the video that can be viewed through and above the open window of driver's side door of car. Graham's lower legs are no longer visible. His arm is lowered back down still holding gun in hand, clearly contrasted with road surface, pointed parallel to ground then downward, as still visible through the open driver's side window of car. Little still in stride in pursuit, has raised arm with gun to shooting position. |

| Time | Description |
|---|---|
| 08:15:49 (media time 00:30 to 31) | Graham moving further right, with head, right shoulder, and arm fully into the area that can be seen above the driver's side door of car. His right elbow is rising along with forearm. Graham's left elbow, waist, belt, and upper legs are still visible through open window of the driver's side door of car. Little still in pursuit, shortened stride, arm outstretched in shooting position.<br>(Corresponds to still image of video filed at DE 86-6 p. 4). |
| 08:15:49 (media time 00:32) | Graham continuing, with whole torso now into the area that can be seen above the driver's side door of car, with swift movement of arm towards right in front of car. Little still in pursuit, shortened stride, arm outstretched in shooting position. (At this moment, on the full-speed video, a police officer can be heard yelling out something that sounds like "watch your shot";[6] the slow-motion video does not reveal decipherable sounds). |
| 08:15:49 (media time 00:33) | Graham's arms now blocked in view by side and top of car, with only head and torso still visible, seen moving or jumping suddenly upwards and forward. Little now stationary, with right leg leading, right arm stretched out in shooting posture, left arm out to left side, left leg planted behind. |
| 08:15:49 (media time 00:34) | Only tip of Graham's head remaining in view above top corner of car, moving in direction out of view. Little has moved into view in area partially blocked by driver's side door of car, leaning further forward in direction of Graham, but with left leg brought up slightly.<br>(At this moment, on the full-speed video (media time 10:18), and the slow motion video (media time 00:34) the sound of a first gunshot from defendant Little's gun can be heard). |
| 08:15:50 (media time 00:35) | Little is advancing forward with outstretched arm, torso viewable in space seen through driver's side window, and head and arm viewable in space above driver's side door. (At this moment, on the full-speed video (media time 10:18), the sound of a second and third gunshot from defendant Little's gun can be heard). |
| 08:15:50 (media time 00:37) | Little's right arm advances into area blocked in view by side and top of car. |
| 08:15:51 (media time 00:40) | Little has moved entirely out of view into area blocked by side and top of car. |

---

[6] Defendant Little believes he shouted a command for Graham to "get on the ground." (Little Dep. 93-94). Further discussion of Defendant Little's commands is included in the court's discussion and analysis, below.

| Time | Description |
|------|-------------|
| 08:15:52 (media time 00:49) | End slow-motion video run time. |

In supplement to the information provided by the dash-cam video, defendant Little testified that he observed that Graham was grasping the handle of a gun in his hand at one moment where Graham was in stride and was pointing the gun in the air. (Little Dep. 95). It was at that point, that defendant Little drew his weapon from the holster, (see id.), corresponding to the time 08:15:47 in the time-line above, where Graham points his gun momentarily in the air while in stride. Defendant Little recognized and was familiar with the Glock 22 handgun that Graham had in his hand, and defendant Little knew from his training, education, and experience that the Glock 22 handgun can be fired from the firing grasp position in less than 1 second. (Little Aff. ¶ 17).

Defendant Little also testified that he could still see the gun in Graham's right hand, when Graham looked back at defendant Little, (Little Dep. at 97-98), which corresponds to the time 08:15:48 in the time-line above. Further, defendant Little testified that before firing his first shot, defendant Little observed Graham's arm "about chest high," in the process of extending out from his body to the right of his body, where it broke a "90 degree plane," such that defendant Little saw the "barrel of the weapon was coming back" in defendant Little's direction. (Id. 100-101; see Little Aff. ¶ 20; DE 86-4 at 6). Although such observed arm movements are not shown completely in the dash-cam video, the video at the beginning 08:15:49 shows Graham's right arm rising and moving rapidly towards the right, as he is moving out of view, in the fraction of second before the first shot is fired. Unbeknownst to defendant Little, Graham had commenced these observed arm movements

with the intention of throwing his gun, and Graham had released his gun into the air during the 08:15:49 second before being hit by the first bullet shot by defendant Little.[7]

Defendant Little was looking at the center of Graham's body as he fired his gun at Graham three times in short succession, and he did not see the Graham's gun fly from Graham's hand or its trajectory. (Little Dep. 103-105). Two of defendant Little's shots hit Graham in the back between 08:15:49 and 08:15:50, and Graham fell to the ground a fraction of a second thereafter near the right side of the road in front of the car. (Id. at 107).

Defendant Little yelled for Burlingame to come and assist, so he could get Graham handcuffed. (DE 89 at 18). Defendant Little also notified dispatch that shots had been fired and emergency medical services were needed. (Id.). Burlingame did not observe the shots being fired because he was trying to secure Willis, but he heard three shots fired. (Id.). Burlingame turned toward the area where he heard the shots come from and observed defendant Little with his gun drawn covering Graham. (Id.). Burlingame told defendant Little to maintain his position while he secured Willis. (Id. at 19). Burlingame secured Willis and put him in his patrol car. (Id.). Burlingame then ran over to defendant Little who continued to cover Graham by pointing his weapon. (Id.).

The officers approached Graham together with defendant Little still covering Graham at gunpoint due to the officers not knowing if Graham still had the weapon. (Id.). Burlingame instructed Graham to roll over. (Id.). When Graham stated he could not move his legs, Burlingame did not move Graham's lower body, but placed him in handcuffs. (Id.). Burlingame stayed with

---

[7] The court details further below in discussion and analysis the several sources of evidence from which this summary factual sentence is drawn.

Graham until backup arrived. (Id.). Defendant Little maintained cover on Graham until backup arrived because the officers still did not know where Graham's gun was located. (Id.).

When Burlingame came over to assist defendant Little, defendant Little stated "I don't know where the gun is at – I don't know if it's underneath him or where it's at," as can be heard on the dash-cam video. (Dash-cam video 08:19:22 to 08:19:25). Two other officers arrived on the scene, and at one point on their dash-cam video can be heard the exchange: "Where's the weapon at?" followed by a response "I don't know – I had him at gunpoint." (Roth-Roffy dash-cam video at 08:20:08 to 08:20:12). While officer Burlingame was over near Graham, an officer can be heard asking "where's the weapon you had?" to which Graham responds "I threw it, man." (Dash-cam video 08:21:08). Then, Graham asks "what did you shoot me for, man?" to which no response can be heard. (Dash-cam video 08:21:08).

Thereafter, defendant Little searched in the grass in the area around Graham, while Burlingame was working to secure Graham's arms in handcuffs. (Roth-Rothy dash-cam video at 08:20:28 to 08:20:46). Eventually, defendant Little was able to see the weapon about 30 feet away from Graham, "on the other side of [a] chain link fence," and directed another officer to secure the area around the weapon. (Little Aff. ¶ 24; Little Dep. DE 74-1 at 119).

Graham was transported to Cape Fear Valley Medical Center and treated on May 1, 2013, where he was diagnosed as paralyzed from the waist down as a result of the gunshot wounds. (DE 89 at 20; see DE 36-4 at 9). Graham then entered into a rehabilitation center. (See id.). On July 2, 2013, a few days after being discharged from rehabilitation, Graham collapsed at his home and died. (See id.). An autopsy report was prepared by Scott, based upon an autopsy examination conducted on July 3, 2013. (DE 36 ¶4; DE 36-4 at 5). The autopsy report describes two gunshot wounds in

Graham's body: 1) one which partially lacerated the thoracic spinal cord, with wound track from Graham's back to front, left to right and slightly upward; 2) the other which perforated parts of the kidney and small intestine, with wound track from back to front, slightly upward without veering significantly right or left. (DE 36-4 at 6-7). The autopsy report states Scott's opinion that "the cause of death is a pulmonary embolus due to deep venous thrombosis, due to paraplegia, due to a gunshot wound to the back." (Id. at 9).

**DISCUSSION**

A.      Plaintiff's Motion to Strike (DE 71)

Plaintiff moves to strike testimony of Scott, West, and Bailey, upon which defendants rely, on the basis that opinions stated in their affidavits were not timely disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2). In general, "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705" as experts. Fed. R. Civ. P. 26(a)(2)(A). "Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).

Defendants were not required to disclose Scott, West, and Bailey as experts in this case because these witnesses were not retained or specially employed to provide expert testimony. Scott, for example, states in her affidavit that, as part of her duties as Associate Chief Medical Examiner at the North Carolina Office of the Chief Medical Examiner, she prepared an autopsy report of her examination of Graham, and provided the report of complete autopsy examination on or about

14

September 23, 2013, before commencement of the instant action.  (See DE 36-4 ¶¶ 1-4).  As such, defendants did not need to disclose Scott as an expert for purposes of testifying as to what she did in her autopsy examination and the findings thereof.

Likewise, West testifies as to actions he took in determining whether criminal charges were warranted against the police officers involved in the instant action. (DE 36-9).  Defendants did not need to disclose West as an expert for purposes of such testimony.

Finally, Bailey testifies to the actions he took as part of an internal investigation into the shooting incident in this case as an employee of the FPD, particularly as to his examination of photographs of Graham's gun. (DE 36-3).  Defendants did not need to disclose West as an expert for purposes of such testimony.

By contrast, portions of Scott's affidavit constitute testimony that goes beyond merely stating what she did in her autopsy examination and the findings thereof.  Scott testifies, for example, "In my professional opinion, to a reasonable degree of medical certainty, the gunshot wound to the thoracic spinal cord would not prevent Mr. Graham from having the strength and ability to throw a gun approximately thirty feet over a fence."  (DE 36-4 ¶8).   Here, Scott is providing an opinion as a medical professional regarding a matter beyond the scope of her autopsy examination. Defendants have not laid a foundation for Scott's ability to testify reliably as to Graham's ability to throw after a gunshot wound to the thoracic spinal cord.  While the court recognizes defendants' argument that Scott is offering an opinion akin to that of a treating physician, Scott's testimony at paragraphs 6-9, and 12, of Scott's affidavit is at the outer bounds of such analogy, and plaintiff has demonstrated sufficiently plaintiff's surprise by the inclusion of such testimony without prior

disclosure. Therefore, the court strikes, and does not consider, paragraphs 6-9, and 12, of Scott's affidavit, for purposes of the instant motion for summary judgment.

In sum, based on the foregoing, plaintiff's motion to strike is granted in part and denied in part as set forth herein. For the same reasons, plaintiff's alternative motion to reopen discovery is denied.

B.      Defendants' Motion to Strike in the Alternative (DE 90)

Defendants object to a portion of plaintiff's statement of material facts, or, in the alternative, move to strike any reference, citation, or use of the SBI report of Graham's statement in plaintiff's statement of material facts. The court need not reach defendants' alternative motion to strike because the court addresses the substance of defendants' objection in the court's analysis of defendants' summary judgment motion, as set forth in further detail below. Accordingly, defendants' alternative motion to strike is denied as moot.

C.      Motions to Seal (DE 79, 88)

Plaintiff moves to seal the SBI file and autopsy photographs provisionally sealed by the court on September 15, 2016. Plaintiff also moves to seal certain exhibits filed in conjunction with plaintiff's response to defendant's statement of material facts. Plaintiff reserves the position, however, that certain portions of the SBI file should be accessible to the public.

In evaluating a motion to seal, in accordance with the mandatory procedure outlined by the Fourth Circuit in <u>Stone v. University of Maryland</u>, 855 F.2d 178 (4th Cir.1988), the court must first "determine [whether] the source of [the public's] right of access . . . is based on the common law or the First Amendment" with respect to each document to be sealed. <u>Id.</u> at 180. This is because

"different levels of protection may attach to the various records and documents involved in [a] case."

Id.

"The common law presumes a right to inspect and copy [all] judicial records and documents," and this presumption "may be overcome if competing interests outweigh the interest in access." Id. (citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978); Rushford v. The New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir.1988); In re Washington Post Co., 807 F.2d 383, 390 (4th Cir.1986)).

The First Amendment guarantees a heightened presumption of access "only to particular judicial records and documents," including "documents filed in connection with [a] summary judgment motion in civil case." Id. (citing Rushford, 846 F.2d at 253). "Where the First Amendment guarantees access, . . . access may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." Id. (citing Rushford, 846 F.2d at 253; Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510 (1984)).

To ensure proper weighing of such interests, "a court must first give the public notice of a request to seal and a reasonable opportunity to challenge it." Id. at 181 (citing In re Knight Publishing Co., 743 F.2d 231, 235 (4th Cir.1984)). "While individual notice is unwarranted, the court must notify persons present in the courtroom of the request, or docket it 'reasonably in advance of deciding the issue.'" Id. (quoting Knight, 743 F.2d at 235). "The court must consider less drastic alternatives to sealing and, if it decides to seal documents, must 'state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review.'" Id.

This court previously addressed sealing of certain materials filed in conjunction with the instant motion for summary judgment, at hearing held September 9, 2016. The court determined that the public's right to access to dash-cam video of the incident and slow motion footage of the same outweighs any right to keep sealed this material, but that the balance shifted towards maintenance of the seal of the Roth-Roffy video. The court now has occasion to consider anew what materials ought to remain sealed in connection with the court's summary judgment ruling. As a guiding principle under the circumstances of this case, the court holds that the public's right of access generally outweighs governmental interests in sealing for all evidence expressly relied upon herein in this order.

Applying this principle, the court grants in part and denies in part the motions to seal, and directs modification of other document designations as follows. The SBI file under seal at DE 75, shall remain filed under seal. Autopsy photos, under seal at DE 76, shall remain filed under seal.

By contrast, the motion (DE 79) and memorandum in support thereof (DE 80), excluding Exhibit E thereto (DE 80-5), do not themselves contain confidential information for which an interest in sealing outweighs the public right of access. Therefore, the clerk is directed to unseal DE 79 and DE 80, as well as all exhibits thereto, **except** Exhibit E (DE 80-5).

Likewise, the clerk is directed to unseal the following documents, which may also be included as part of the same SBI file, but which are filed separately as proposed sealed exhibits at DE 86: DE 86-2 (Appendix); DE 86-4 (SBI Statement of Officer Little); and DE 86-5 (SBI Statement of Lawrence Graham). In addition, defendants are directed to file on the public docket pages 4 to 12 of DE 86-6, which is an investigatory document containing still shots of the dash-cam videos cited herein, while remaining portions of DE 86-6, comprising investigatory materials not

18

cited herein, shall remain under seal. Likewise DE 86-7 and DE 86-8 shall remain under seal as police investigatory materials.

As such plaintiff's motions to seal are granted in part and denied in part as herein set forth.

In light of the foregoing, the court has cause to reconsider that portion of its September 9, 2016, text order regarding sealing of the entirety of the dash-cam video of officer Roth-Roffy (DE 38). A portion of that video is relevant to the court's ruling herein, whereas the government interest in maintaining confidential investigatory material outweighs the public access in the remainder. Accordingly, the court directs defendants to manually file as publicly accessible exhibit a redacted version of the Roth-Roffy video, previously filed manually, where such redacted version shall contain only that portion of the video from time designated on the video as 08:19:46 to 08:20:49.

D.     Summary Judgment

1.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); see United States v. Monsanto Co., 858 F.2d 160, 171 (4th Cir. 1988). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

2.  Analysis

a.  Excessive Force

Where a defendant police officer asserts a defense of qualified immunity, a two-step inquiry applies. "The first step is to determine whether the facts, taken in the light most favorable to the non-movant, establish that the officer violated a constitutional right." Yates v. Terry, 817 F.3d 877, 884 (4th Cir. 2016). If the facts establish the violation of a constitutional right, at the second step,

20

courts determine whether that right was clearly established. Id. In this case, the facts taken in the light most favorable to the non-movant do not establish the violation of a constitutional right. Therefore the court need not reach the second step. See id.

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. "The calculus of reasonableness must embody  allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97. "The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996); see Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991) (stating that an officer's liability must "be determined exclusively upon an examination and weighing of the information the officers possessed immediately prior to and at the very moment they fired the fatal shots").

"Proper application [of the test of reasonableness] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of

serious physical harm to the officer or others." Elliott, 99 F.3d at 642. "[T]he mere possession of a firearm by a suspect is not enough to permit the use of deadly force." Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013). Nevertheless, "an armed suspect need not engage in some specific action such as pointing, aiming, or firing his weapon to pose a threat[;] . . . there are many circumstances under which a police officer could reasonably feel threatened." Id. at 159 n. 9. Moreover, "[o]fficers need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection." Elliot, 99 F.3d at 644.

In this case, applying these principles, the undisputed facts and disputed facts viewed in the light most favorable to plaintiff do not establish a Fourth Amendment excessive force violation. Based upon multiple factors and the circumstances of this case, defendant Little had sound reason to believe that Graham posed a threat of serious physical harm to defendant Little or others at the moment he fired his shots. As an initial matter, with respect to the severity of the crime at issue, defendant Little was aware that Willis and Graham both were suspected of a drug offense, as there was a strong odor of marijuana coming from the vehicle. (Little Aff. ¶¶ 6-8; dash-cam video 08:14:38). These suspicions were strengthened after defendant Little observed Burlingame remove bags coming out of Willis's waistband, which defendant Little understood to be controlled substances. (Little Dep. 90).

In the meantime, when defendant Little arrived at the passenger door in front of Graham, defendant Little told Graham to "sit tight," and defendant Little told Graham a second time to "sit tight," after Graham asked what was going on with "bro." (Little Dep. 88). A reasonable officer

in defendant Little's position would have understood that he had made a command to Graham to stay in place and not to get out of the car.

At this point, the circumstances escalated from a relatively measured search process to a very tense and fast-developing struggle between the officers and the suspects. Early in the development of the circumstances, both officers and the public immediately were placed in danger by the fact that as Burlingame was starting to retrieve another bag of marijuana, Willis attempted to flee from Burlingame. (DE 89 ¶14). Willis actively resisted arrest by trying to push away from Burlingame, whereupon Burlingame put Willis to the ground to restrain him. (Id.).

As is notable from the dash-cam video of the incident, Willis began screaming loudly at that point, substantially contributing to the tenseness and confusion at the scene. (Dash-cam video 08:15:45). In other words, before the next critical moments even began, Burlingame and defendant Little were confronted with an already dangerous scenario involving a traffic search yielding strong odor of marijuana, discovery of multiple drug items, one suspect who had physically resisted an officer, and that same suspect screaming loudly.

At that very instant, Graham began to flee out of the car. (DE 89 ¶15). Not only would this flight reasonably be perceived as a risk to Burlingame and the public, but also this flight was in direct contravention of defendant Little's earlier and direct commands to him to "sit tight." (Id. ¶13). Thus, in addition to a serious crime under investigation, a second Graham factor is present in that both Willis and Graham were attempting to evade arrest by flight. See Graham, 490 U.S. at 396.

Graham's use of a firearm added a substantial defining factor to the calculus of an officer on the scene. In the one second that followed, (08:15:45 - 08:15:46), as Graham was just exiting completely from the car, defendant Little observed that Graham was holding a gun in his right hand

in firing position, (Little Dep. 95), a fact that would have changed the perspective of a reasonable officer in defendant Little's position from that of an already serious situation to one that presented a grave risk of serious physical harm to the officer or others.

Notably at that point, Graham did not just drop the gun on the ground or show any sign of de-escalating the situation. To the contrary, in the next second that followed, Graham continued running around towards the front of the car, and turning his head back facing little, still holding his gun in firing position as he was striding forward. (See dash-cam video 08:15:47-08:15:48). By that moment, defendant Little perceived that, in an instant, Graham could have fired a shot at him. (Little Aff. ¶ 17). Indeed, where Willis had already resisted seizure from Burlingame, with a push and physical struggle against Burlingame, an officer in defendant Little's position reasonably could fear more fatal resistance from Graham through use of his firearm, held in firing position. The combined circumstances of Willis's resistance and Graham's fleeing, all accompanied in an instant by loud screaming by Willis, reasonably could have been perceived as the start of a serious coordinated effort to threaten the officers on the scene. In addition, Graham's rapid and open flight away from defendant Little in a residential neighborhood,[8] armed and suspected of serious drug offense, after having been told by defendant Little to "sit tight," posed a serious risk of injury to the public. Therefore, at that point, mid-way through the 08:15:48 second, multiple factors already justified application of deadly force against Graham.

In the second that followed, circumstances presented to defendant Little augmented that justification. Defendant Little knew that Graham saw him in pursuit, but that Graham was

---

[8] Vehicles can be seen freely passing on the street in the minutes prior to the time Graham flees from the car with gun in hand. A school bus passed by the scene only six minutes prior to Graham's flight from the car. (See dash-cam video 08:09:33 to 08:09:52).

continuing to move swiftly towards the area in front of the car, and can be seen moving his gun with his arm's stride in hand. (Dash-cam video 08:15:48; Little Dep. 98). Within a fraction of one second that followed, defendant Little yelled out something loudly to Graham, which, though unintelligible, reasonably would have been perceived by an officer in the circumstances as a final attempt to give warning to Graham to cease his movements. (Dash-cam video 08:15:49; Little Dep. 93-94). Graham did not cease his movements, but to the contrary commenced an upward and outward arm movement, during which movement Graham's gun broke a "90 degree plane" such that defendant Little saw the "barrel of the weapon was coming back" in defendant Little's direction. (Little Dep. 100-101; see Little Aff. ¶ 20; DE 86-4 at 6).

Given all that had preceded in the seconds leading up to that moment, an officer in defendant Little's position reasonably would have perceived an immediate threat to his safety from a gunshot from Graham's gun, which defendant Little understood could be fired at any point in its movement. At that moment when defendant Little saw the barrel of the weapon coming back in his direction, defendant Little was justified in firing his gun to incapacitate Graham and prevent Graham from firing at him first. Defendant Little's application of deadly force thus was reasonable and was not a violation of Graham's Fourth Amendment rights.

In so holding, the court infers in the light most favorable to plaintiff that Graham had already commenced a movement for purposes of throwing his gun, or even had just released his gun from his hand, by the time Graham was hit by the first bullet fired by defendant Little. In particular, the court infers that, during the 08:15:49 second, Graham commenced outward arm movements for purposes of throwing his gun, and Graham had released his gun into the air during that 08:15:49

second, but no earlier, before being hit by the first bullet shot by defendant Little at the end of the 08:15:49 second.

This factual inference is drawn from several sources of evidence, including the following. The dash-cam video shows that, at the last fraction of the 08:15:48 second, Graham's arm is at approximate waist level, still holding gun in hand, clearly contrasted with the road surface, with the gun pointed parallel to ground for a moment then downward, as still visible through the open driver's side window of car. (See dash-cam video, slow motion, 08:15:48 (media time 00:28)). Graham's next motion seen on the video at the beginning of 08:15:49 is raising up his right elbow along with his forearm, followed by continued rapid movement of right arm. (dash-cam video, slow motion, 08:15:49 (media time 00:30 to 32)).[9] The dash-cam video thus shows that Graham did not throw his gun at any point prior to the 08:15:49 second, although it is possible that Graham released the gun during the upward and outward arm movements seen during that second, without the gun being visible in the video. Defendant Little's observation that Graham made a sudden movement to the right with his arm, where the barrel of his gun broke a "90 degree plane," (Little Dep. 100-101), immediately before defendant Little fired his first shot, is consistent with the movements seen at 08:15:49 on the dash-cam video. Where it is possible that those arm movements were commenced by Graham with the intention to throw the gun, culminating in the release of the gun,

---

[9] Although it can be further inferred from the video that the gun momentarily is visible pointing upwards during 08:15:49, (see e.g., DE 86-6 at 4 (still image of dash-cam video)), the image is not clear enough to rule out an inference that the gun is not visible at this point in time.

the court infers that Graham had commenced those movements and released his gun into the air during the 08:15:49 second, before defendant Little fired the first shot.[10]

Accepting as a fact that Graham had released his gun before being shot, however, there is no evidence that defendant Little realized this before he pulled the trigger on his own gun, or even that he realized this after he had shot Graham twice. Regardless of Graham's intentions in throwing the gun, defendant Little reasonably perceived Graham's continued rapid upward and outward movements, including at one point seeing the barrel of the gun as coming back in his direction, during an extremely rapid sequence of movements before firing his first shot, as a threat to his life. In considering these circumstances, the court is mindful of the Supreme court's guidance that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. This case presents a paradigmatic example of one needing allowance for split-second judgments, given the tight time frame of threatening activity on the part of Graham.

Moreover, plaintiff proffers no evidence to permit an inference that defendant Little knew Graham had released his gun. To the contrary, defendant Little testified: "I did not see what happened with Graham's right arm or his weapon as I discharged my weapon." (Little Aff. ¶ 22). He explained that during the time period he was discharging his firearm, he did not maintain focus on Graham's gun, but was looking rather at Graham's "center section, center mass where [he] was

_____

[10] Although a different inference can be drawn from the evidence that defendant Little fired the first shot before Graham commenced any movement to throw the gun, where Graham's upper body movement and momentum plausibly were sufficient to launch the gun, the court draws the contrary inference in favor of Graham, in light of the possibility that the first gun shot lodged in Graham's spine, and the possibility that the first gun shot rendered Graham unable to commence a throwing action sufficient to send the gun 30 feet and over a fence.

aiming at." (Little Dep. 104). It is undisputed that once Graham hit the ground, defendant Little

yelled at Graham to show his hands because Little did not know where Graham's handgun was

located. (Little Dep. 104-105, 114; Little Aff. ¶23). Plaintiff admits that "[t]he Officers approached

Graham together with Officer Little covering Graham at gunpoint <u>due to the Officers not knowing</u>

<u>if Graham still had the weapon</u>." (DE 89 ¶32) (emphasis added). After Burlingame first came to

provide assistance, the officers can be heard questioning the whereabouts of the gun. (dash-cam

video 08:19:22 to 08:19:25; DE 89 at 19). Only after Graham was secured, and after Graham had

communicated to officers that he had thrown his gun, defendant Little found the gun in the grass in

an adjacent yard. (Little Aff. ¶ 24, Little Dep. 119; dash-cam video 08:21:00 to 08:21:05).

It is even less plausible to infer that defendant Little recognized that Graham had eliminated

a threat to safety through his movements to throw the gun, in the fraction of a second before

defendant Little fired his weapon. By continuing to flee with gun in hand, raising up with swift,

unpredictable movements, Graham gave no indication to defendant Little of any intention besides

defying defendant Little's previous command to "sit tight," creating danger to defendant Little and

others. In addition, the gun itself was capable of being a dangerous projectile. As noted previously,

it is significant to the excessive force analysis that Graham did not stop his flight or merely drop his

weapon in the moments after defendant Little saw Graham looking back.

In sum, an officer in circumstances presented to defendant Little immediately before he fired

his gunshots reasonably would have perceived an imminent threat to his safety from Graham's

handling of his gun. Thus defendant Little did not apply excessive force under the circumstances.

Plaintiff argues, apparently in the alternative, that the court should accept as a fact that

Graham threw his gun immediately upon exiting the car, thus leaving no justification for defendant

Little's shots several seconds later. In support of this argument, plaintiff points to statements made in the report of SBI interview attributed to Graham that "<u>As soon as I hopped out [of the car] I threw the gun</u> because it was on the right side of my pocket. It was sliding out of my pants. I caught it and <u>as soon as I stepped out I threw the gun</u>." (DE 86-5 at 3) (emphasis added). Those statements, however, must be disregarded because they are directly contradicted by the images in the dash-cam video. See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (holding that court on summary judgment must "view[] the facts in the light depicted by the videotape" where the videotape "blatantly contradict[s]" the plaintiff's account). In particular, the dash-cam video clearly shows Graham holding the gun at several points until he is at the other side of the car door running towards the front of the car, in the last fractions of the 08:15:48 second. (See dash-cam video, slow motion, 08:15:46 (media time 00:19) to 08:15:48 (media time 00:28)). In this manner, the video "blatantly contradict[s]" Graham's statement that he threw the gun "as soon as [he] stepped out" of the car. Accordingly, sustaining defendants' objections, the court must disregard Graham's contrary statement and view the facts consistent with the video.

In addition, plaintiff suggests that the court should disregard defendant Little's account of events because defendant Little's account described in his deposition is inconsistent with the account attributed to defendant Little in an SBI statement. Those portions of defendant Little's account which are relied upon by the court in the analysis herein, however, are consistently described by defendant Little, and they are consistent with the dash-cam video. For example, defendant Little testified consistently as to the critical fact that defendant Little observed Graham's arm break a 90 degree plane such that defendant Little saw the barrel of the gun coming back in his direction, in the moment before he fired his first shot. According to a report of an SBI interview:

Little stated . . . he (Graham) bolted from the passenger's seat and exited the vehicle through the open driver's side door (opposite side). Little said he initially thought Graham was headed to assist in the altercation between Willis and Burlingame, but Graham instead headed towards the front of the suspect's vehicle and away from Burlingame and Willis. Little stated he 'broke out' around the rear of the suspect's vehicle in pursuit. Little said he yelled for Graham to get on the ground, but Graham continued running. Little stated as he ran behind Graham, he observed a weapon. Little said, 'I see his right hand come up above his shoulder-line with a weapon in his hand. I immediately identified the weapon as a Glock based on the profile itself.' He saw Graham's head break back towards his (Graham's) right shoulder. Little added, 'I remember seeing the white of his right eye peer back at me. <u>I observed the weapon in his right hand break a 90 degree plane back in my direction at which time I discharged my firearm two (2) times</u>.

\*          \*          \*

Little stated Graham existed the vehicle via the open driver's side door. Graham then fled towards the front of the vehicle away from Willis and Burlingame. Little said he saw Graham's right hand come up above his shoulder-line with a weapon in his hand and his shoulder-line with a weapon in his hand and his (Graham's ) head break back towards his right shoulder. Little also said he saw "the white of his right eye peer back at me." <u>Little then observed the weapon in Graham's right hand break a 90 degree plane back in Little's direction</u>.

(DE 86-4 at 5-7) (emphasis added). In his deposition, defendant Little testified as follows:

Q.      Now, after you removed the firearm from the holster and pointed it at the center mass of Mr. Lawrence, what did you observe next?

A.      Obviously at that time the threat of deadly force was in front of me. He looked over his right shoulder at me and I could see the white in his eye. I remember seeing the white in his eye, like he was picking me up in his sights behind him.

Q.      Now, where was the firearm at that time?

A.      In his – in his hand?

Q.      Yes.

A.      It was in his right hand. I don't know, it was –

Q.      Was it still above his shoulder?

A.      At this point I don't know if he was on a down stride with his arm or where exactly it was at in the air, but it was still in his right hand.

30

Q.      All right.  From the first time that you saw the firearm, was there a period of time after that that you no longer saw the firearm?

A.      Well, during his strides I would obviously not be able to see while he was coming down in front his body and then back up.

*       *       *

Q.      Then did there come a time that you saw the firearm again?

A.      There was.

Q.      And when you saw the firearm again, was it still in his right hand?

A.      It was.

Q.      All right.  Was it above his shoulder like before –

A.      No.

Q.      – or was it somewhere else?

A.      It was somewhere else.  It was pointed to the right of him and away from him.

Q.      Now, where on his body was the firearm?  Before it was above his shoulder, was it at his chest, at his waist?

A.      I would say about chest.  About chest high.

Q.      Okay.  And was his right arm extended out from his body?

A.      Yes, it was extending around, in the process of extending.

Q.      So his right arm was extended out from his body to the right of his body;  is that correct?

A.      That's correct.

Q.      And was his arm extended backward toward where you were?

A.      It was coming in my direction, like I noted in my reports – or like, you know, when I gave my statements.  I was – the weapon broke a 90 degree plane.

*       *       *

31

Q.     And was his right arm , that was extended out from his body about chest level, extended backwards toward you at that time?

A.     <u>At the last time I had seen it before I shot</u> –

Q.     Yes.

A.     – <u>it was coming – it broke the 90 degree plane, it come back [sic] my direction.  The barrel of the weapon was coming back my direction</u>.  . . .

\*          \*          \*

Q.     Okay.  Now, <u>when you observed the firearm in his right hand with his arm extended out a chest level break the 90 degree plane</u>, what did you do?

A.     I discharged my firearm.

(DE 74-1 at 98-103) (emphasis added).

There is no inconsistency with defendant Little's statement as recorded in the SBI report and his statements in his deposition regarding the position of Graham's gun immediately prior to the time defendant Little fired his first shot.  Moreover, defendant Little's statement and deposition testimony are consistent with the dash-cam video.  The court has already inferred in the light most favorable to plaintiff that Graham was in the process of throwing and releasing his gun before being shot.  But, Graham's movements for purposes of throwing his gun are consistent with defendant Little's account that the barrel of the gun broke the 90 degree plane back in the direction of defendant Little, which defendant Little reasonably perceived as a threat to his life.

In sum, drawing all reasonable factual inferences in favor of plaintiff, an officer in the position of defendant Little reasonably would have perceived an imminent threat to his safety from Graham's handling of his gun, justifying the use of deadly force against Graham.  Therefore, plaintiff has not established that defendant Little violated a constitutional right.

b.    Additional Claims

Where plaintiff has failed to establish a violation of a constitutional right by defendant Little, plaintiff's federal claims based upon supervisory liability or policy or custom arising from conduct by defendant Little (seventh and eighth causes of action) must fail as a matter of law. See Kentucky v. Graham, 473 U.S. 159, 166 (1985) (stating "a governmental entity is liable under § 1983 only when the entity itself is a moving force behind [a] deprivation" of constitutional rights caused by an individual officer); Evans v. Chalmers, 703 F.3d 636, 654 (4th Cir. 2012) (stating that "because we hold that all plaintiffs failed to state predicate § 1983 claims against the individual officers, we must also hold that all plaintiffs have failed to state supervisory liability [and] Monell liability" claims); Young v. City of Mount Ranier, 238 F.3d 567, 579 (4th Cir. 2001) ("[A] section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee.").

In addition, having failed to establish a Fourth Amendment violation based upon excessive force, plaintiff's state tort claims against defendants in their individual and official capacities based upon application of deadly force (first through sixth causes of action) also must fail. See Sigman v. Town of Chapel Hill, 161 F.3d 782, 789 (4th Cir. 1998) ("[B]ecause we have concluded that Officer Riddle's actions were, as a matter of law, reasonable in the circumstances of this case, they cannot be negligent or wrongful, as required by N.C. Gen. Stat. § 28A-18-2(a)."); Njang v. Montgomery Cty., Maryland, 279 F. App'x 209, 216 (4th Cir. 2008) ("[T]he jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence.") (quotations omitted); see also Todd v. Creech, 23 N.C. App. 537, 539 (1974); N.C. Gen. Stat. § 15A-401(d).

Moreover, plaintiff's tort claims against the City and its officers in their official capacities are barred by the doctrine of governmental immunity.  See Koontz v. City of Winston-Salem, 280 N.C. 513, 521 (1972); Anderson v. Town of Andrews, 127 N.C. App. 599, 600 (1997).  Having proffered no evidence that any of the individual officers acted with malice or corruption, plaintiff's state tort claims against defendants in their individual capacities are barred by public official immunity.  See Meyer v. Walls, 347 N.C. 97, 112 (1997).

In sum, based on the foregoing, defendants are entitled to summary judgment as to all claims asserted against them.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 34) is GRANTED. Plaintiff's motions to strike and to seal (DE 71, 79, 88) each are GRANTED IN PART and DENIED IN PART as set forth herein.  Plaintiff's alternative motion to reopen discovery, included with plaintiff's motion to strike at DE 71 is DENIED.  The clerk is DIRECTED to adjust sealed designations as set forth above, at section C of this order.  Defendants are DIRECTED to file redacted versions of exhibits, as also specified therein, within 10 days from date of entry of this order.  Defendants' alternative motion to strike (DE 90)[11] is DENIED AS MOOT.  The court has determined that this order shall be filed in its entirety without sealing any portion thereof, even though it references materials provisionally filed under seal.  The clerk is DIRECTED to close this case.

SO ORDERED, this the 10th day of February, 2017.

LOUISE W. FLANAGAN
United States District Judge

---

[11]  The clerk is DIRECTED to ensure that this motion is correctly designated on the CM/ECF system as a motion to strike instead of a motion to stay, as may have been noted inadvertently in the docket text at DE 91 and in submission of the motion to the court.